# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Osborne & Francis PLLC, a Florida
Limited Liability Company

      925 S. Federal Hwy Suite 175
      Boca Raton, FL 33432,

Wright & Schulte, LLC, a Domestic
Limited Liability Company

      865 South Dixie Drive
      Vandalia, OH, 45377,

Leander Ross
      751 Harveytown Road
      Tylertown, MS, 39667,

Kenneth McCovery
      7065 Crandall Road
      Grand Bay, AL, 36541,

                      *Plaintiffs,*
    vs.

Thomas Vilsack, in his official capacity as
Secretary of The United States
Department of Agriculture,

      1400 Independence Ave., S.W.
      Washington, DC 20250,

United States Department of
Agriculture,

      1400 Independence Ave., S.W.
      Washington, DC 20250,

                      *Defendants.*

_____/

## **COMPLAINT**

Plaintiffs Osborne & Francis PLLC ("Osborne"), Wright & Schulte, LLC ("Schulte") (together, the "Law Firm Plaintiffs"), Leander Ross, and Kenneth McCovery (together, the "Claimant Plaintiffs") bring this Complaint against Defendants Thomas Vilsack, in his official capacity as Secretary of the United States Department of Agriculture ("Secretary Vilsack"), and the United States Department of Agriculture ("USDA"), to challenge the USDA's implementation of the Discrimination Financial Assistance Program ("DFAP"). Plaintiffs allege as follows:

## PRELIMINARY STATEMENT

1.      For decades, the USDA has engaged in well-documented discrimination against minority farmers across the country. Congress acknowledged this history of discrimination and attempted to provide monetary relief for victims in the Inflation Reduction Act of 2022, 136 Stat. 1818 § 22007 (the "IRA"), which provided $2.2 billion dollars in financial assistance for "farmers, ranchers, or forest landowners determined to have experienced discrimination prior to January 1, 2021, in Department of Agriculture farm lending programs." The USDA, under the direction of Defendant Secretary Vilsack, has developed a process for affected farmers to apply for this relief under the IRA, called the Discrimination Financial Assistance Program ("DFAP"). However, they have done so in a manner that is arbitrary, capricious, and unconstitutional, imposing an unacceptable burden on victims' rights to retain legal counsel in this necessarily adversarial process, and denying any right to administrative appeals of the USDA's determinations for how this money should be distributed.

2.      Critically, the USDA has refused to allow farmers to direct that awards be paid out to the care of their attorneys: the USDA has stated unequivocally that it refuses to recognize or honor powers of attorney signed by claimants, and in particular will not honor powers of attorney in which claimants direct that payments be sent to their attorneys; more generally, the USDA

application for relief contains no mechanism for allowing claimants to identify an attorney payee. Nowhere in the text of the IRA did Congress allow the USDA to affirmatively ignore claimants' payment instructions, or to disregard their valid powers of attorney. There is only one reason for this refusal: the USDA's program is designed to make it difficult or impossible for lawyers to represent farmers in this program on a contingency basis, by making the collection of contingent fees extremely difficult to collect, and virtually impossible to collect at any scale – thus rendering it uneconomical to provide legal services on a contingency fee basis. In turn, this makes it burdensome for most victims of the USDA's discrimination to obtain any counsel at all: with the exception of a small minority of farmers with the means to pay in advance for hourly services of counsel, most farmers rely on contingent-fee arrangements to secure assistance in this program.

3.      Moreover, the participation of attorneys is essential to ensuring a fair and just distribution of the $2.2 billion in funds allocated for victims of discrimination. The USDA has promulgated a 40-page application for farmers seeking relief under the IRA, and that burdensome application contains numerous references to evidentiary standards and other concepts that the average farmer will more successfully navigate and complete with the assistance of counsel. And this application is critically important, since the USDA currently affords *no opportunity for appeal* if an application is denied, despite claimants' significant financial interest at stake. A "process" like this is barely a process at all, and at a minimum is one that requires the assistance of counsel to maximize the likelihood of funds being distributed in an equitable manner.

4.      By refusing to provide basic procedures that would enable attorneys to participate in the program on a contingent-fee basis, and by failing to provide an appellate review process, the USDA is unlawfully failing to live up to Congress's desire to remedy a history of discrimination against our nation's minority farmers. Precluding such farmers (except the wealthy few who can

afford to hire attorneys by the hour) from selecting the counsel and fee arrangements of their choice—and leaving them to fend for themselves in proving discrimination and damages before the very agency found to have discriminated against them in the past—violates Congress's intent in promulgating the IRA, and also Plaintiffs' Constitutional rights. Similarly, failing to provide review for denied claims is likely to lead to erroneous deprivation of benefits in violation of statutory intent and the Constitutional right to Due Process.

5.      Accordingly, Plaintiffs bring this action under Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706(2)(A) and (B), and the Court's equitable powers to enjoin violations of the U.S. Constitution, including the Fifth Amendment's Due Process guarantee, and the First Amendment guarantees of free speech and the right to petition. The DFAP procedure employed by the USDA must be set aside for two reasons:

a.      *First*, the USDA acted arbitrarily and capriciously in implementing the DFAP, interfering with the ability of attorneys to represent farmers on a contingency basis, and making a denial of a DFAP award impossible to appeal administratively. Those rules barring payment to attorneys and administrative appeals must be set aside, and the agency ordered to honor powers of attorney or other client directives regarding the payment of awards, and to implement an administrative appeal process, under the DFAP.

b.      *Second*, the DFAP was implemented in ways that contravene the First Amendment and Due Process rights of farmers, including Claimant Plaintiffs. These unconstitutional rules must be set aside, and the agency ordered to honor powers of attorney or other client directives regarding the payment of awards under the DFAP, and to provide an administrative appeal process.

## PARTIES

### A.    Plaintiffs

6.     Plaintiff Osborne & Francis PLLC is a limited liability company registered in the State of Florida, with its principal place of business located at 925 S. Federal Hwy Suite 175, Boca Raton, Florida, 33432. Since its founding in 2018, Osborne & Francis has operated as a full-service law firm aiding a variety of clients in a wide range of legal matters, including a history of representing farmers who suffered discrimination at the hands of the USDA.

7.     Plaintiff Wright & Schulte LLC is a limited liability company registered in the State of Ohio, with its principal place of business located at 865 South Dixie Drive, Vandalia, Ohio, 45377. Since its founding in 2012, Wright & Schulte has operated as a full-service law firm aiding a variety of clients in a wide range of legal matters, including a history of representing farmers who suffered discrimination at the hands of the USDA.

8.     Plaintiff Leander Ross is an individual claimant seeking to receive benefits from the USDA under DFAP and is a current client of Law Firm Plaintiffs. His farm, which operated from 1980 to 1990 in Tylertown, Mississippi, mainly harvested corn and raised cattle. (The IRA provision of compensation applies to all victims who suffered discrimination before 2021, without a time limit.) In or about 1985, Mr. Ross sought a Farm Operating Loan from the USDA at his local USDA office in Tylertown, MS, but was wrongly told that he could not apply—ultimately leading to foreclosure. In applying for relief under the DFAP, he instructed that any payment be issued to his attorneys, and the USDA is refusing to honor that instruction.

9.     Plaintiff Kenneth McCovery is an individual claimant seeking to receive benefits from the USDA under DFAP and is a current client of Law Firm Plaintiffs. His farm, which operated from 1988 to 2022 in Grand Bay, Alabama, mainly focused on livestock including cows

and hogs. In or about 2001, he sought a Farm Ownership Loan, Farm Operating Loan, and Youth Loan from the USDA, and filled out a loan application through a USDA representative at the Small Business Administration at the University South of Alabama Campus. Despite his experience with farming and livestock and his good credit, the USDA declined to give him any loan. Because of the USDA's failure to provide him with a loan, he lost important financial support to replace his equipment and missed a season's harvest, resulting in a sale of cattle due to financial difficulties. In applying for relief under the DFAP, he instructed that any payment be issued to his attorneys, and the USDA is refusing to honor that instruction.

### B.    **Defendants**

10.    Defendant Thomas Vilsack is the Secretary of the United States Department of Agriculture and promulgates and enforces regulations passed by the USDA, including the Discrimination Financial Assistance Program. Secretary Vilsack maintains an office at 1400 Independence Ave., S.W., Washington, D.C., 20250. Secretary Vilsack is sued in his official capacity.

11.    Defendant USDA is an executive department of the United States and is responsible for implementing the Discrimination Financial Assistance Program. The USDA is headquartered at 1400 Independence Ave., S.W., Washington, D.C., 20250.

### <u>JURISDICTION AND VENUE</u>

12.    Jurisdiction in this Court is grounded upon and proper under 28 U.S.C. § 1331, because this action arises under the Constitution and laws of the United States (including the APA and the Constitution's First and Fifth Amendments).

13.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) and 5 U.S.C. § 703, because at least one Defendant resides in this judicial district, and a substantial part of the events giving rise to the claims occurred within this judicial district.

## FACTUAL BACKGROUND

### A.     The USDA Has a Long History of Discriminatory Practices Against Minority Farmers

14.     The USDA was founded in 1862 in the midst of the Civil War. Its goal is to promote agriculture production, maintain rural conservation programs, and support rural American farming communities. Made up of 29 agencies, the USDA operates with a yearly budget of over $500 billion dollars.

15.     Since its founding, the USDA's reach has expanded tenfold. The agency offers programs in areas such as agriculture risk and price loss coverage, conservation reserve, margin protection services, disaster assistance, emergency relief, farm loans, labor stabilization, and organic certification cost sharing.

16.     Most, if not all, of the programs administered by the USDA require that an interested party go through an application process to receive financial aid or government support. And in approving applications for aid or lending programs, USDA has an extensive record of discrimination against minority farmers.

17.     The history of the USDA's discrimination against minority farmers dates back to its establishment and has been extensively documented during the 20th century.

18.     Concerned about the possibility of discrimination in the USDA, in 1965, the United States Commission on Civil Rights released a study explaining that "[t]he federally assisted State extension services of the South are administered through a separate structure and generally on a

discriminatory basis, often with separate and inferior offices for Negro staff."[1] The Commission recommended "[t]hat the President direct the Secretary of Agriculture to end discriminatory practices in the administration of Department programs."[2] This was the first full report detailing the extent of USDA's discrimination against minority farmers but would not be the last.

19.     Years later, in 1982, the Commission released a study detailing the steady decline of Black-operated farms.[3] The study cited factors including disparity in funding provided to Black and white land-grant colleges and institutions, and difficulty for smaller farms—which often were also Black-owned farms—to seek federal funding.[4] The 1982 study also observed that the black farming community's "deep distrust" and "lack of knowledge regarding possible lending programs" prevented utilization of federal lending programs.[5]

20.     In 1994, the litany of reports of discrimination led the USDA to commission an independent consulting firm to analyze the treatment of minorities in the USDA Farm Service Agency ("FSA") loan and payment programs.[6] The study found that minority farmers tended to take part less in FSA programs, in part because of the length of the process, the lack of trust and confidence in those making the final decisions, and the difficulties with the bureaucracy.[7] Notably,

---

[1] *Equal Opportunity in Farm Programs: An Appraisal of Services Rendered by Agencies of the United States Department of Agriculture. A Report of the United States Commission on Civil Rights, 1965*, U.S. COMM'N ON CIVIL RTS. (1965), https://www.ewg.org/sites/default/files/2022-03/1965_USCCR-Report.pdf.
[2] *Id.*
[3] *The Decline in Black Farming in America*, U.S. COMM'N ON CIVIL RTS. (Feb. 1982), https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/1982_Civil-Rights-Commision-Report.pdf?_gl=1*4fo1gm*_gcl_au*NzcxODczODY0LjE2OTkwMTkxODA.*_ga*NjcwMjg0Nzk5LjE2OTkwMTkxODA.*_ga_CS21GC49KT*MTY5OTMxMzE2OS40LjEuMTY5OTMxMzIwNC4wLjAuMA..&_ga=2.248608967.1177361209.1699313169-670284799.1699019180.
[4] *Id.* at 51.
[5] *Id.* at 65.
[6] *The* Pigford *Cases: USDA Settlement of Discrimination Suits by Black Farmers*, CONG. RSCH. SERV. (May 29, 2013), https://www.everycrsreport.com/files/20130529_RS20430_dd9873a41009e49aa63cdc17a785093c21f8eb23.pdf (summarizing study's findings).
[7] *Id.*

the study found that loans to Black males were on average 25% less than loans to white farmers, and that less than 1% of all disaster payments went to Black farmers.[8]

21.     Following the release of the 1994 study, the then-secretary ordered a thorough investigation into racial discrimination in USDA loan programs and created a USDA Civil Rights Task Force, which recommended significant changes to the USDA's structure.

22.     The USDA's practice of discrimination led to four lawsuits on behalf of minority farmers. All demonstrated the same common theme: the USDA discriminated against groups of minority farmers while carrying out its federal programs.

23.     In 1997, a class action suit was filed by African American farmers alleging the USDA engaged in discriminatory practices in its farm loan programs dating back to 1983. *Pigford v. Glickman* resulted in a settlement supplying $1.06 billion in relief to African American farmers who suffered racial discrimination at the hands of the USDA. 185 F.R.D. 82 (D.D.C. 1999). Because many affected applicants did not obtain a determination on the merits in *Pigford*, Congress provided an additional opportunity for late-filing claimants to petition for a determination on the merits, providing those claimants with a new right to sue. Those claims were consolidated as *In re Black Farmers Discrimination Litigation*. No. 08-MC-511 (D.D.C.). In 2010, *In re Black Farmers* resulted in a settlement of $1.25 billion in relief to African American farmers who suffered racial discrimination at the hands of the USDA.

24.     In 1999, a class action suit was filed by Native American farmers alleging the USDA engaged in discriminatory practices in its uneven grants of low-interest rate loans and loan servicing. Over 10 years later, *Keepseagle v. Vilsack* resulted in a settlement which supplied $760

---

[8] *Id.*

8

million in relief to Native American farmers who suffered from credit discrimination at the hands of the USDA. 856 F.3d 1039 (D.C. Cir. 2017).

25.     In 2000, a group of Latino and Hispanic farmers filed suit alleging that the USDA discriminated against Latino and Hispanic farmers. *Garcia v. Vilsack*, 563 F.3d 519 (D.C. Cir. 2009). The USDA created a system in which affected farmers could take part in a voluntary claims process, and over $1.33 billion was set aside to compensate eligible farmers and their accompanying discrimination claims (to be shared with others with similar claims).

26.     In 2001, a group of women farmers filed suit alleging that the USDA discriminated based on gender in administering its farm loan benefits. *Love v. Vilsack*, No. 00-2502 (RBW) (D.D.C. Jun. 13, 2014). The USDA created a system in which affected farmers could take part in a voluntary claims process, and over $1.33 billion was set aside to compensate eligible farmers and their accompanying discrimination claims (to be shared with others with similar claims).

27.     Though the lawsuits offered substantial settlement claims to the victims of discrimination, all four took a significant amount of time to resolve—nearing a decade of litigation, negotiation, and withholding of funds that the applicant farmers were owed.

28.     In 2008, the USDA and the Secretary—then also Mr. Vilsack—explained their commitment to addressing the agency's history of discrimination. Under Vilsack's guidance, the USDA worked to close all civil rights actions against the agency, emphasized civil rights training to USDA employees, and improved outreach efforts to minority communities and farmers.

29.     Despite Vilsack's efforts to bridge the gap between white and minority farmers, Black farmers faced significant barriers in carrying out their farming businesses. A 2012 census of agriculture noted that Black farmers received only $64 million in subsidies, a drop in the bucket

9

compared to white farmers' receipt of over $8 billion in subsidies.[9] Similarly, a 2016 study noted that Vilsack claimed to initiate real change in the USDA's practices, but the results were not nearly as satisfactory as he claimed.[10]

30.    The failure of Vilsack's initiatives instead *increased* the already-large gap in black and white farming practices. A 2017 census reflected a mere $59.4 million in subsidies to Black farmers, in comparison to $9.7 billion in subsidies to white farmers.[11] A 2019 report pointed to difficulties that Black and minority farmers face when seeking financial support from USDA programs and explained that "historically disadvantaged groups are less likely to have access to or be familiar with computer technology and the internet, and that credit applications and related financial education programs are now provided online."[12]

---

[9]    *Selected Farm Characteristics by Race*, USDA NAT'L AGRIC. STATISTICS SERV. (2012), https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/2012_Ag-Statistics.pdf?_gl=1*fqsn03*_gcl_au*NzcxODczODY0LjE2OTkwMTkxODA.*_ga*NjcwMjg0Nzk5LjE2OTkwMTkxODA.*_ga_CS21GC49KT*MTY5OTM5MTk0Mi42LjAuMTY5OTM5MTk0Mi4wLjAuMA..&_ga=2.214703191.1177361209.1699313169-670284799.1699019180.

[10] *USDA Microloans for Farmers: Participation Patterns and Effects of Outreach*, Sarah Tulman et al., ECON. RSCH. SERV. (Dec. 2016), https://www.ers.usda.gov/webdocs/publications/81871/err-222.pdf?v=42761.

[11] *2017 Census of Agriculture Race/Ethnicity/Gender Profile*, USDA NAT'L AGRIC. STATISTICS SERV. (2017), https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/2017-Ag-Census.pdf?_gl=1*15fgfra*_gcl_au*NzcxODczODY0LjE2OTkwMTkxODA.*_ga*NjcwMjg0Nzk5LjE2OTkwMTkxODA.*_ga_CS21GC49KT*MTY5OTM5MTk0Mi42LjEuMTY5OTM5MjE5Ny4wLjAuMA..&_ga=2.43079909.1177361209.1699313169-670284799.1699019180.

[12] *Agricultural Lending: Information on Credit and Outreach to Socially Disadvantaged Farmers and Ranchers Is Limited*, U.S. GOV'T ACCOUNTABILITY OFFICE (July 2019), https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/2019_GAO-Report.pdf?_gl=1*odnkz9*_gcl_au*NzcxODczODY0LjE2OTkwMTkxODA.*_ga*NjcwMjg0Nzk5LjE2OTkwMTkxODA.*_ga_CS21GC49KT*MTY5OTAzMTkyMi4yLjEuMTY5OTAzMjEzMS4wLjAuMA..&_ga=2.239691331.1765041136.1699019180-670284799.1699019180.

**B.      The Inflation Reduction Act's Enactment**

31.      On August 16, 2021, President Joe Biden signed the Inflation Reduction Act into law. After its passage, the "USDA recognize[d] the Department has not done enough historically to ensure all customers have equal access to its programs and services."[13]

32.      Section 22007 of the IRA created the Discrimination Financial Assistance Program ("DFAP"), which "provides $2.2 billion in financial assistance for farmers who have experienced discrimination in USDA's farm lending programs."

33.      The relevant provision of the IRA states:

> (e) DISCRIMINATION FINANCIAL ASSISTANCE.—In addition to amounts otherwise available, there is appropriated to the Secretary of Agriculture for fiscal year 2022, to remain available until September 30, 2031, out of any money in the Treasury not otherwise appropriated, $2,200,000,000 for a program to provide financial assistance, including the cost of any financial assistance, to farmers, ranchers, or forest landowners determined to have experienced discrimination prior to January 1, 2021, in Department of Agriculture farm lending programs, under which the amount of financial assistance provided to a recipient may be not more than $500,000, as determined to be appropriate based on any consequences experienced from the discrimination, which program shall be administered through 1 or more qualified nongovernmental entities selected by the Secretary subject to standards set and enforced by the Secretary.

34.      While the statute's text directs the Secretary to implement the DFAP, nothing in the plain text of the statute suggests that Congress intended or desired that victims of past discrimination should be denied the right to be represented by the counsel of their choice in applying for aid under the DFAP or that applicants should be barred from seeking administrative appeals. Moreover, nothing in the plain text of the statute permits the USDA to affirmatively ignore payment instructions from valid powers of attorney.

---

[13] *Loans*, USDA, https://www.farmers.gov/loans.

35.     On October 14, 2022, the USDA sought input from the public on the factors that should be used to determine eligibility for the financial assistance program, the factors that should be used to determine the amount of the payouts under the financial assistance program, the role that third-party entities should play in delivering financial assistance to successful applicants, and how other USDA programs could be used in conjunction with the IRA to support individuals who had experienced discrimination.

36.     In requesting public comments on these issues, the USDA specifically acknowledged its history of discrimination, and explained that "[w]hen USDA commits acts of discrimination, it not only hurts the individuals and entities directly impacted, but it also breaks a trust with those directly affected and the communities of which they are part."[14] Moreover, the USDA explained that the fundamental function of DFAP was to "provid[e] USDA the tools to rebuild that trust by directly acknowledging the wrongs that have been committed and taking concrete actions to offset those wrongs."[15]

37.     On July 7, 2023, the USDA opened the Discrimination Financial Assistance Program to the public for applications for compensation.

### C.     The Discrimination Financial Assistance Program

38.     As implemented, the DFAP presents severe hurdles for affected farmers seeking relief, including a complex application with intricate legal language, lack of an appellate process, and harsh deadlines for the applicant.

39.     The DFAP application is a sprawling document separated into ten steps: (1) About You; (2) Type of Applicant; (3) Eligibility for this Program as a Farmer and/or Rancher; (4)

---

[14] Notice of Request for Public Comment on Providing Financial Assistance for Producers and Landowners Determined To Have Experienced Discrimination, 87 Fed. Reg. 62359 (Oct. 14, 2022).
[15] *Id.*

Eligibility for this Program as a Borrower or Attempted Borrower in a USDA Farm Loan Program; (5) Discrimination In USDA Farm Loan Programs; (6) Losses from Discrimination for Applicants Who Have Operated a Farm or Ranch; (7) Prior Claims, Complaints, and Appeals; (8) Additional Information; (9) Taxpayer Information Request; and (10) Signatures and Certifications.

40.    As originally released, the DFAP application was forty-pages, which was extensive and burdensome. However, the USDA has since altered the application twice. First, on October 24, 2023, the USDA added explanation sections to the application—after erroneously omitting them. Then, after Law Firm Plaintiffs asked the USDA how to attach additional pages on behalf of their clients who had suffered more than one instance of discrimination, the USDA updated the application again. The final application was an eighty-five-page document.

41.    The changes to the DFAP application had multiple detrimental effects on claimants and added significant burdens to their respective counsel. Law Firm Plaintiffs were forced to backtrack and change their entire internal processes to finalizing applications in December, after some of their clients' applications had already been finalized months prior. Nonetheless, these changes highlight the degree to which participation of counsel has helped the USDA develop a more robust application process that is better suited for implementation of its program than the USDA originally developed before active involvement from counsel. Indeed, only when the application's deficiencies were pointed out to the USDA—less than thirty days before applications were due—did the USDA make adjustments to the application.

42.    The application uses language that a layperson, unfamiliar with legal jargon, may not understand before submission. For example: "the evidentiary standard is substantial evidence," "preponderance of the evidence," "evidence that a reasonable person could accept as adequate." The applicant is asked to sign their application under penalty of perjury. And the application

requires a specific skill set that lawyers are trained to provide. Specifically, the USDA is requesting that claimants provide evidence of the damage caused by the USDA's discrimination. Lawyers, who make damages analyses in their line of work on a regular basis, are familiar with the types of evidence that the claimants are required to provide, such as receipts of sale, foreclosure notices, or other tangible items that some claimants otherwise would not know to include. The application also requests that claimants draft a compelling narrative detailing their experience. Lawyers, who understand the nature of persuasive advocacy and know what details are integral to include in such narratives, are essential to this process—without their help, claimants may not be able to effectively portray the discrimination they faced at the hands of the USDA.

43.     Unlike the in-depth appellate processes associated with other agency aid applications, such as the determination of social security benefits, the USDA Frequently Asked Questions provides that "the form and the submitted documents constitute the entire Application; there will be no hearings and no appeals."[16]

44.     Unlike the latitude often given to pro se litigants in court—who are often unfamiliar with legal processes—the USDA treats the application deadline under the DFAP as entirely inflexible: "Applications submitted after the deadline will not be reviewed. If [an applicant's] Application is late, [it] will not receive financial assistance."[17]

45.     Officially, the DFAP materials state that the USDA "neither recommend[s] that any applicant retain counsel or retain a specific attorney or law firm, nor discourage[s] an applicant from obtaining counsel or using a specific attorney or law firm."[18]

---

[16] *Frequently Asked Questions*, USDA https://www.22007apply.gov/media/FAQ_Printable_English.pdf.
[17] *Id.*
[18] *Financial Assistance Application Process Opens for USDA Farm Loan Borrowers Who Have Faced Discrimination*, USDA (July 7, 2023), https://www.fsa.usda.gov/news-room/news-releases/2023/financial-assistance-application-process-opens-for-usda-farm-loan-borrowers-who-have-faced-discrimination#:~:text=Applicants%20are%20not%20required%20to, specific%20attorney%20or%20law%20firm.

46.      As the USDA explains, "[t]he Application for this program is extensive,"[19] and nearly every step requires multiple mandatory supportive documents for the application to be considered complete. Moreover, if an applicant misses a step or piece of the application, "it will be evaluated on the basis of the information that is included; there will be no extensions."[20] And not only is its length daunting; it requires an understanding of specialized language only used within the legal landscape. Given the evidence that "historically disadvantaged groups are less likely to have access to or be familiar with computer technology and the internet, and that credit applications and related financial education programs are now provided online,"[21] and given that these programs will be administered by contractors who may make mistakes processing such a lengthy application, counsel's assistance has been essential for many claimants' ability to successfully prepare an application.

47.      Once an individual submits the application, it proceeds through an eight-step review process.

48.      To help administer the program's application process, the USDA has hired private contractors to serve as regional hubs and national administrators.[22] The regional hub provides support to applicants in a particular geographic area, and among other duties, is charged with "[r]eviewing individual Applications, making initial determinations of eligibility and evaluating the Application against USDA-approved standards and using corroborating data where available." The national administrator is charged with overseeing the program, and among other duties, is

---

[19] *Frequently Asked Questions*, USDA https://www.22007apply.gov/media/FAQ_Printable_English.pdf.
[20] *Id.*
[21] *Agricultural Lending: Information on Credit and Outreach to Socially Disadvantaged Farmers and Ranchers Is Limited*, U.S. Gov't Accountability Office (July 2019), https://static.ewg.org/reports/2021/BlackFarmerDiscriminationTimeline/2019_GAO-Report.pdf?_gl=1*odnkz9*_gcl_au*NzcxODczODY0LjE2OTkwMTkxODA.*_ga*NjcwMjg0Nzk5LjE2OTkwMTkxODA.*_ga_CS21GC49KT*MTY5OTAzMTkyMi4yLjEuMTY5OTAzMjEzMS4wLjAuMA..&_ga=2.239691331.1765041136.1699019180-670284799.1699019180.
[22] *Program Overview*, https://22007apply.gov/program-overview.html.

charged with "[r]eviewing individual Applications, making determinations of eligibility and evaluating the Application against USDA-approved standards, using corroborating data from the USDA where available, [a]rranging for appropriate audits and systems to detect and deter fraud, [m]aking final decisions on individual Applications, subject to oversight by USDA, [and d]istributing the financial assistance after approval by USDA."

49.     The entities contracted to serve as regional hubs or national administrators include: The Midtown Group, AgrAbility, Farmer Veteran Coalition, Farmers' Legal Action Group, Federation of Southern Cooperatives, Intertribal Agriculture Council, Land Loss Prevention Project, National Young Farmers Coalition, and Rural Coalition.

50.     Upon the submission of an application, a regional hub or national administrator logs and acknowledges receipt of the application.

51.     Then, the regional hub makes a preliminary determination of eligibility, and considers—for the purposes of receiving monetary compensation—if the applicant actively farmed or attempted to farm and/or ranch, if the applicant actively participated or attempted to participate in USDA farm lending programs, and if the applicant experienced discrimination by the USDA before 2021.

52.     The regional hub scores the application using a USDA-approved rubric and determines the applicant's eligibility according to the criteria aforementioned in paragraph 51. The rubric serves as a method to evenhandedly evaluate claimants, and as a guide for hubs to carry out the USDA's intent.

53.     The application then proceeds to a national administrator, who reviews the application using the same eligibility criteria as the regional hub.

54.     The national administrator scores the application using a USDA-approved rubric and determines the applicant's eligibility.

55.     Discrepancies in eligibility determinations between the national administrator and the regional hub are resolved by the national administrator, with deference to the regional hub's determination.

56.     If approved by the national administrator, the application is then referred to the USDA for approval of payments. If there is a large difference in eligibility determinations between the regional hub and national administrator, the USDA will provide oversight.

57.     While the national administrator makes the final decision on the applicant's eligibility, that determination is subject to USDA review. The USDA will either approve the payment to the applicant if there are no substantial discrepancies between the regional and national hubs or resolve any relevant differences between the regional and national hubs. Then, the USDA returns the application to the national administrator to make payments to the applicants, or to inform the claimant of denial.

58.     While the original deadline was January 13, 2024, The Midtown Group notified Law Firm Plaintiffs during the final moments preceding the deadline—January 13, 2024, at 11:44 PM EST—that the deadline was being extended to January 17, 2024, due to "Winter Weather Conditions and Brief E-Portal Outage."

59.     On behalf of 4,982 claimants, the Law Firm Plaintiffs submitted claim forms and supporting documentation before the deadline. The Law Firm Plaintiffs did extensive work assisting these claimants, in reliance on the fact that the USDA's application obviously required the assistance of counsel for the vast majority of claimants. At the time Law Firm Plaintiffs were performing this work, the USDA made no effort to inform the public that it was going to

irrationally and arbitrarily refuse to honor any powers of attorney or other instructions from claimants regarding their choice to retain legal counsel.

60.     Throughout this process, the regional hubs and national administrators have been largely unresponsive to Law Firm Plaintiffs. On December 21, 2023, Law Firm Plaintiffs reached out to representatives of the USDA and one of the contractors—The Midtown Group—seeking confirmation that the USDA received the claim forms and supporting documentation they had submitted on behalf of their clients. While the representatives of the USDA and The Midtown Group did generally confirm the receipt of uploaded files, they provided no confirmation of any specific claimants' names and USDA claim numbers.

61.     After Law Firm Plaintiffs sent twelve requests for confirmation from The Midtown Group as to the status of their submissions, at 4:45 PM EST on January 12, 2024—the day before the submission deadline—The Midtown Group finally provided Law Firm Plaintiffs with a list of the claimants whose applications they had submitted. However, the list provided had significant errors and omissions; it failed to provide confirmation of receipt for over 1,000 claimants that Law Firm Plaintiffs had submitted applications for and contained multiple typographical and clerical errors. To be certain, Law Firm Plaintiffs immediately and timely resubmitted *all* 4,982 claim forms and supporting documents to ensure their clients' applications were properly submitted. On January 13, 2024, the day of the original deadline to submit claim forms and supporting documentation, the USDA provided a revised list of received claims. This list, too, had significant typographical and clerical errors. Law Firm Plaintiffs are continuing to do substantial amounts of work to ensure that these applications were correctly processed upon receipt, and this only further emphasizes the extent to which Law Firm Plaintiffs are providing an important, valuable service for claimants and for the USDA's implementation of the DFAP program itself.

D.   **Law Firm Plaintiff's Representation of Applicants**

62.    The USDA's pattern of discrimination has resulted in extreme distrust between minority farmer communities and the USDA. Minority farmers have well-founded reasons to question the USDA's ability to process their loan programs in a nondiscriminatory manner. This doubt and hesitation are not new; the USDA itself has acknowledged the understandable skepticism that applicants have towards the USDA's ability to evenhandedly provide government aid.[23]

63.    Law Firm Plaintiffs are law firms who represent many applicants for aid under DFAP.

64.    Law Firm Plaintiffs offer invaluable support to minority farmers nationwide, including their historic win for Black farmers as lead counsel in *In re Black Farmers*.

65.    Because of their long-established history of fighting for the rights of minorities under USDA programs, Law Firm Plaintiffs provide their clients with significant reassurance that their applications will be completed properly. In light of a potential claim payout of up to $500,000 per claimant, such reassurance is *essential* to their clients.

66.    However, because many clients cannot afford to pay for representation ahead of their claim payouts, Law Firm Plaintiffs agreed to represent their clients on a reduced 25% contingency fee basis. This 25% fee is significantly less than many contingent-fee arrangements, which can provide for fees up to 40%. Such a system allows for Law Firm Plaintiffs to ensure that their clients are provided with the support needed to obtain funding, regardless of the financial status of the client. Attorneys working on a contingent-fee basis, especially when helping large numbers of individual plaintiffs, count on deducting the proper fee from any award to their clients.

---

[23] Notice of Request for Public Comment on Providing Financial Assistance for Producers and Landowners Determined To Have Experienced Discrimination, 87 Fed. Reg. 62359 (Oct. 14, 2022).

Otherwise, they would have to engage in expensive and burdensome efforts to determine payout amounts, bill clients for the appropriate percentage and, worst of all, potentially have to engage in collection actions against their own clients, who are dispersed throughout the country. When assisting a large number of farmers, such as the thousands that the Law Firms Plaintiffs here have already helped, these burdens make it all but impossible to economically serve this population.

67.     Law Firm Plaintiffs have obtained valid powers of attorney from each of their clients, including Claimant Plaintiffs, directing that their clients' awards under the DFAP be paid to them. Such a system allows for Law Firm Plaintiffs to provide effective representation to their clients, while ensuring that they will be reimbursed for the significant time, effort, and resources dedicated to aiding DFAP applicants.

68.     In November 2023, Law Firm Plaintiffs expressed concerns with the current procedures that the USDA employed in carrying out DFAP, and Law Firm Plaintiffs also requested that the USDA honor the powers of attorney provided to them by their clients.

69.     Before filing the present complaint, in a letter to the USDA, Law Firm Plaintiffs provided several suggestions to the agency. Expressing their concerns with the structure of the USDA's implementation of the DFAP, Law Firm Plaintiffs pointed out that applicants and the USDA "have a shared interest in ensuring the administration of DFAP in a manner that is rational, fair, and efficient."

70.     One of Law Firm Plaintiffs' suggestions was including an internal appellate review process. These processes are integral; the lack of procedural flexibility and complex nature of these applications creates a dangerous risk of error without a second level of review.

71.     A suggestion that Law Firm Plaintiffs provided was the implementation of a release of claim form, which would address the missing second level of review. The proposed form would

act as a notice sent to the claimant and their respective counsel once their claim eligibility was determined. Then, the applicant could either appeal their determination, or accept the claim's determination, release the USDA from all legal claims associated with the determination of their claim, and direct where the award should be paid to.

72.     Law Firm Plaintiffs also suggested the use of a qualified settlement fund. The qualified settlement fund, which would hold all of the compensation to be paid out to approved claimants, would be monitored by a neutral third party to shield against abuse.

73.     Law Firm Plaintiffs' concerns were not heeded; the USDA did not implement any of Law Firm Plaintiff's suggestions. The application remained an intricate web and limited the opportunities for attorneys to provide support and did not provide an opportunity for administrative review of claims denied.

74.     Despite the USDA's lack of interest in Law Firm Plaintiff's suggestions, Law Firm Plaintiffs continued to insist on additional safeguards. On November 27, 2023, Secretary Vilsack conversed with Michael Espy, who is the former Secretary of Agriculture and represented black farmers facing discrimination in *In re Black Farmers*. Secretary Vilsack explained his position that it was in the joint interest of all involved parties that this matter be resolved promptly, ensuring the expeditious disbursement of funds to the thousands of farmers needing financial support.

75.     Following this call, Law Firm Plaintiffs again reached out to the USDA on December 8, 2023, proposing more solutions to address the USDA's concerns raised to Mr. Espy. They proposed that the USDA honor a joint check agreement entered into by the DFAP claimant and Law Firm Plaintiffs. This agreement would enable the USDA to send a check jointly payable to a farmer and their attorney, sent to the lawyer, but with a limitation that it cannot be cashed without both parties' approval. The USDA provided no response.

76.     On December 11, 2023, Law Firm Plaintiffs and their counsel spoke to Mary Beth Schultz, General Counsel at the USDA. The Law Firm Plaintiffs articulated their concerns, but Ms. Schultz offered no position other than that the USDA was concerned about fraudulent or deceptive actions from potential claimants' counsel.

77.     On January 2, 2024, counsel for Law Firm Plaintiffs followed up with Ms. Schultz and proposed various solutions, including the joint-check solution discussed above. They suggested that the check's payment be contingent on several safeguards, *i.e.*, requiring that attorneys submit their active bar numbers, requiring a certificate of good standing from the attorneys' respective states of licensure, requiring attorneys to submit an affidavit verifying no charge to their clients amounting to greater than 25%, or requiring attorneys to submit a malpractice insurance declaration page.

78.     On January 4, 2024, Ms. Schultz responded to the various options proposed by Plaintiffs' counsel, noting that she had "forwarded them to the USDA program implementors."

79.     After weeks of attempted correspondence with the USDA and its contractors, Law Firm Plaintiffs received an email from Margo Schlanger, Senior Advisor at the United States Department of Agriculture. She stated that the USDA declined to adopt *any* of the suggestions supplied to the USDA aforementioned, and instead offered only the possibility that lawyers be provided notice as to the disposition of their clients' applications.

80.     In response to the correspondence from Ms. Schlanger, counsel for Law Firm Plaintiffs sent Ms. Schultz a letter confirming Law Firm Plaintiffs' understanding that the USDA has taken final action refusing to honor, and refusing to have its payment contractors honor, the Law Firm Plaintiffs' powers of attorney with respect to payment of funds, refusing to implement an administrative appeals process, and rejecting all other suggestions that the Law Firm Plaintiffs

provided in good faith. The letter, sent on January 8, noted that if no response was received from the USDA or its contractors, Law Firm Plaintiffs would file a lawsuit challenging the agency's decisions. No response has been received from the USDA or its contractors.

81.    Therefore, the agency has unequivocally confirmed that it will not honor powers of attorney, will not provide any mechanism for claimants to direct payments to their attorneys, and will not provide a process for reviewing or appealing denied claims. Nor will the agency implement any of the Law Firm Plaintiff's proposed safeguards, including a claim release form, or a qualified settlement fund. The USDA's refusal to implement any of Law Firm Plaintiffs' safeguards or suggestions, as expressed by the January 8, 2024, letter received from Margo Schlanger expressing the USDA's position, constitutes final agency action for which Plaintiffs have no other adequate remedy at law. No other administrative review is available to plaintiffs.

82.    The DFAP's structure is designed to make it burdensome and uneconomical for attorneys to represent clients in connection with the DFAP. While the Law Firm Plaintiffs here have already assisted thousands of farmers, they did so on the expectation that their powers of attorney would be honored and that they would be able to deduct their fee directly from any awards made. The USDA's arbitrary and capricious decision to refuse to honor powers of attorney violated the reasonable expectations on the basis of which that work was performed. Further, in light of the USDA's unequivocal refusal to honor powers of attorney, and refusal to provide any economical means for attorneys to assist with DFAP application on a contingent-fee basis, the Law Firm Plaintiffs here were unable to assist any more farmers with the DFAP process: were it not for the USDA's refusal to honor their powers of attorney, they would have been incentivized to continue to assist additional farmers with their claims. This means claimants without financial means, which comprises a large proportion of eligible claimants, were barred from selecting the counsel and fee

arrangement of their choice, and likely were effectively barred from retaining counsel at all in connection with the DFAP. This means some were effectively precluded from applying for aid entirely. On the other hand, claimants who do have financial means to pay an attorney up-front rather than in accordance with a contingency agreement had a significant advantage in applying for aid under the DFAP. These problems are compounded by the lack of any second-level review for denied claims: unrepresented claimants who make ordinary mistakes on their application would not even have the chance to appeal a denial. Similarly, the DFAP provides no appellate review process to correct errors by its contractors, who may lack experience with allocation programs and who will be attempting to implement this brand-new program with a lengthy, detailed application.

83.    Thus, in refusing to direct payments to third-party attorneys, the USDA has caused a concrete and significant injury to Law Firm Plaintiff's businesses, and a concrete and significant injury to Claimant Plaintiffs and other farmers' ability to apply successfully for federal aid. Because of its complexity, without assistance from Law Firm Plaintiffs, many claimants would not have been able to complete the DFAP application, precluding them from receiving aid entirely.

84.    Moreover, Law Firm Plaintiffs cannot wait any longer: if compensation for the award payments is sent to claimants rather than to Law Firm Plaintiffs, the injury to Plaintiffs will *already* have been suffered. Law Firm Plaintiffs will be forced to endure costly and burdensome collections against their own clients.

## <u>COUNT I</u>

### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### On behalf of all Plaintiffs

85.    Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 84 above.

86.     Given the significant complexity of the application process, the potentially life-changing amount of money at stake, the severe consequences of an erroneous application or decision, and the inherently adversarial nature of attempting to prove discrimination in the context of a program overseen by the very agency found to have discriminated, it was arbitrary and capricious for the USDA to have implemented the DFAP in a manner that effectively precludes representation by attorneys on a contingent-fee basis and limits further administrative appeals and review.

87.     Under the APA, a court "shall … hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

88.     The USDA's failure to: (1) provide a system for payment to attorneys representing DFAP claimants; and (2) provide a system for administrative review of decisions denying DFAP claims, is arbitrary and capricious because the USDA did not recognize or discuss important policy alternatives, failed to state legitimate reasons for their justifications, and offered no rational connection to the relevant evidence before the agency, including its own admissions and data. These USDA actions are also contrary to law because they were not authorized by the IRA's provision of the $2.2 billion in financial assistance, but instead thwart the intended purpose of that provision.

89.     Claimant Plaintiffs and Law Firm Plaintiffs alike will be significantly harmed if the DFAP as currently designed is enforced. Claimant Plaintiffs faced heavy burdens selecting counsel of their choice and some were unable to hire counsel at all given the USDA's interference with their ability to retain counsel who works on a contingency-fee basis, precluding some from applying for aid entirely because of the application's complexity. Claimant Plaintiffs, with pending

applications for financial support, will have no ability to contest their determinations due to lack of an administrative review process. Law Firm Plaintiffs will be unable to seek compensation without extreme difficulty for the work they have already completed on behalf of claimants.

90.     Because of the extensive documented history of discrimination applicants faced previously while applying for government funding from USDA programs, applicants were extremely wary of seeking further government funding without assistance of counsel. And by concluding that counsel's participation is unnecessary, the USDA's position is contrary to all evidence before the agency, including the lengthy history of distrust and uncertainty between the two parties.

91.     The USDA itself admits that DFAP applicants have understandable distrust in applying for USDA-approved aid.[24] Despite this admission and *years* of documented evidence of this distrust, the DFAP was implemented with significant barriers to effective attorney representation. Law Firm Plaintiffs provide indispensable services to their clients, and such services would be otherwise unavailable to their clients if not for the ability to use a contingency-fee arrangement. The USDA's decision to prevent the use of such counsel lacks any rational justification, is contrary to Congress's intent in enacting the IRA, and is arbitrary and capricious. At best, the USDA's position is inconsistent. On one hand, the USDA stated publicly that it does not discourage the use of counsel yet imposes requirements and processes whose purposes and overall effect is to prevent the use of counsel. The USDA's inconsistency in itself renders their decision arbitrary and capricious.

---

[24] *USDA Seeking Public Comment on a New Provision to Provide Assistance to Agricultural Producers Who Have Experienced Discrimination*, USDA (Oct. 13, 2022), https://www.usda.gov/media/press-releases/2022/10/13/usda-seeking-public-comment-new-provision-provide-assistance ("USDA recognizes that farmers in these cases did not always feel that their concerns were heard or reflected in the design of the past discrimination claims resolution processes.").

92.     The USDA's failure to provide for an appellate, administrative review process for denied claims lacks any rational justification and is arbitrary and capricious. The DFAP claim form is a lengthy, detailed document that—by itself—determines an applicant's entitlement to a substantial sum of money. It is inevitable that applicants may have struggled with answering some of the more advanced questions or may have unintentionally omitted a piece of information that alters their eligibility determination, but applicants will have no method to appeal their decision or provide any subsequent information to the agency. Therefore, it was arbitrary, capricious, and contrary to all evidence before the agency for the USDA to still implement the program in a way that provides no leeway or flexibility for eligible farmers to contest their determinations.

93.     Plaintiffs seek a judgment: (1) that the rules and processes prohibiting payment of DFAP awards to attorneys, and those refusing to honor powers of attorney, be declared unlawful and set aside as arbitrary and capricious and/or contrary to law, and that Defendants be ordered to cease enforcing those rules and processes; (2) that the rules and processes barring the availability of administrative review be declared unlawful and set aside as arbitrary and capricious and/or contrary to law, and that Defendants be ordered to cease enforcing those rules and processes and to promulgate a system for administrative review of DFAP eligibility determinations and; (3) that any DFAP awards made to clients of the Law Firm Plaintiffs who executed powers of attorney be sent to Law Firms Plaintiffs, as provided for in the powers of attorney.

## COUNT II

### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B)
### On behalf of all Plaintiffs

94.     Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 84 above.

95.     Under the APA, a court "shall … hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity" 5 U.S.C. § 706(2)(B).

96.     The USDA's failure to provide a system for payment to third-party attorneys contravenes the guarantee of Due Process set forth by the Fifth Amendment, and the First Amendment rights to free speech and petitioning the government.

97.     The USDA's failure to provide a system for administrative review for claimants who are denied compensation contravenes the guarantee of Due Process set forth by the Fifth Amendment.

98.     Law Firm Plaintiffs, as firms that would have previously represented additional farmers if not for these restrictions, have standing to represent and assert the interests of known claimants who were unable to retain counsel for assistance throughout the DFAP application process, and the interests of claimants with pending or denied DFAP applications.

99.     Enforcement of the DFAP's policies against the Law Firm Plaintiffs will result in the violation of known claimants' rights to due process.

100.    The decision by USDA to refuse to recognize powers of attorney or other reasonable measures to respect claimants' retention of legal counsel was also announced toward the end of the initial schedule for the DFAP process, and thus retroactively harmed the Law Firm Plaintiffs, who had engaged in substantial efforts based on the reasonable expectation that the USDA would respect their contract arrangements with their clients.

101.    Considerable practical barriers limit an unrepresented claimant's ability to bring suit on their own behalf alleging a violation of their due process rights, since this is a complex area of law and claimants would be, by definition, unrepresented by counsel. Additional barriers include

(but are not limited to) the financial burden that such a suit would impose (which is why claimants sought representation on a contingency-fee basis), and disincentives to sue emanating from both the distrust of the government's ability to be impartial and claimants' urgent need for financial support.

102.    The Fifth Amendment of the United States Constitution guarantees that no person can be deprived of life, liberty, or property interests without due process. U.S. Const. Amend. V. Due process includes the right to be heard at a meaningful time and in a meaningful manner. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). It also protects against the retroactive deprivation of rights and reasonable expectations.

103.    The right to adequate representation in front of an adverse party constitutes a significant private interest of Claimant Plaintiffs and for any farmer who is unrepresented but would be represented by counsel if not for the unconstitutional restrictions imposed by Defendants in connection with the DFAP.

104.    Because of the USDA's unequivocal refusal to honor powers of attorney, and refusal to provide any economical means for attorneys to assist with DFAP application on a contingent-fee basis, the Law Firm Plaintiffs were unable to assist any more farmers with the DFAP process. If not for the DFAP's processes, Law Firm Plaintiffs would otherwise have continued to help additional farmers apply for aid. This means claimants without financial means were effectively barred from retaining counsel at all in connection with the DFAP, amounting to a denial of those claimants' right to adequate process. Similarly, Claimant Plaintiffs are barred from retaining Law Firm Plaintiff's counsel for any current or future legal representation in connection to the present adversarial process against the government. Such a restriction on the right to representation

amounts to a denial of adequate process and creates a significant risk that applicants will be erroneously denied benefits to which they would be entitled under the DFAP.

105. The government's interests will not be burdened by the incorporation of additional procedure into the DFAP application processes. Payment of claims is handled not by the USDA but by government contractors; a direct payment to attorneys does not involve any greater burden or cost to the government, either directly or through its contractors. Moreover, the assistance that attorneys provide their clients would, in fact, ease administrative burdens: attorneys will help ensure that claimants submit complete, accurate applications, and attorneys working on contingency will have a financial and ethical incentive to screen out improper and meritless claims for relief, which will provide for a smoother process for the government's review. And there is *no* legitimate government interest in allowing the USDA to summarily deny inadequately prepared claimant applications.

106. Additionally, the ability to administratively appeal a government agency's eligibility determination for receipt of benefits constitutes a significant private interest of Claimant Plaintiffs and for other known farmer claimants who apply for aid under the DFAP.

107. The lack of any administrative appeals process creates a significant risk that applicants will be erroneously denied benefits to which they would otherwise be entitled under the DFAP.

108. The government's interests will not be burdened by the incorporation of additional procedure into the DFAP application processes. Providing a centralized, transparent system of review will decrease the likelihood of subsequent litigation, and ensures payments are going to as many eligible farmers as possible, consistent with Congress's intent in promulgating the IRA.

109.    The First Amendment sets forth that Congress shall make no law "abridging the freedom of speech," and further protects the right to "petition the Government for a redress of grievances." U.S. Const. Amend. I.

110.    Claimant Plaintiffs and other potential clients of Law Firm Plaintiff have the right to employ the representative of their choosing to petition for redress and speak on their behalf. By infringing on their ability to select counsel of choice, and limiting the compensation arrangements for such counsel, the USDA also infringes on the First Amendment rights of Claimant Plaintiffs and unrepresented claimants who would be represented but for these unlawful practices. The ability for Claimant Plaintiffs to retain counsel is effectively what enables Claimant Plaintiffs to state their claims for discrimination and seek government redress. By hindering that representation, the USDA hinders the exercise of Law Firm Plaintiff's First Amendment rights.

111.    Applicants in the DFAP process, including Claimant Plaintiffs and other farmers who would have been represented by the Law Firm Plaintiffs if not for the restrictions at issue, were harmed and will continue to be harmed by Defendants' unlawful acts.

112.    Law Firm Plaintiffs have also been injured by the USDA's retroactive refusal to honor the contractual arrangements of their claimant clients.

113.    Plaintiffs seek a judgment: (1) that the rules and processes prohibiting payment of DFAP awards to attorneys, and those refusing to honor powers of attorney, be declared unlawful and set aside as contrary to a constitutional right, and that Defendants be ordered to cease enforcing those rules and processes; (2) that the rules and processes barring the availability of administrative review be declared unlawful and set aside as contrary to a constitutional right and that Defendants be ordered to cease enforcing those rules and processes and to promulgate a system for administrative review of DFAP eligibility determinations and; (3) that any DFAP awards made to

clients of the Law Firm Plaintiffs who executed powers of attorney be sent to Law Firms Plaintiffs, as provided for in the powers of attorney.

### COUNT III

**Violation of the Fifth Amendment Guarantee of Procedural Due Process
On behalf of all Plaintiffs**

114.    Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 84 above.

115.    The USDA's failure to provide a system for payment to third-party attorneys contravenes the guarantee of Due Process set forth by the Fifth Amendment.

116.    The USDA's failure to provide a system for administrative review for claimants who are denied compensation contravenes the guarantee of Due Process set forth by the Fifth Amendment.

117.    The Fifth Amendment of the United States Constitution guarantees that all individuals must be provided with procedural due process, meaning that no individual can be deprived of life, liberty, or property interests without process that the law requires. U.S. Const. Amend. V. Included in the implications of procedural due process are the right to be heard at a meaningful time and in a meaningful manner. See *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

118.    The right to adequate representation in front of an adverse party constitutes a significant private interest of Claimant Plaintiffs and for any farmer who was unrepresented but would have otherwise been represented by counsel if not for the unconstitutional restrictions imposed by Defendants in connection with the DFAP.

119.    Law Firm Plaintiffs, as firms that would have represented additional farmers if not for these restrictions, have standing to represent and assert the interests of known claimants who were otherwise be unable to retain counsel for assistance throughout the DFAP application process.

120.    Enforcement of the DFAP's policies against the Law Firm Plaintiffs has resulted in the violation of known claimants' rights to due process.

121.    Considerable practical barriers limit the known, unrepresented claimants' ability to bring suit on their own behalf, since this is a complex area of law and claimants would be, by definition, unrepresented by counsel. Additional barriers include (but are not limited to) the financial burden that such a suit would impose (which is why claimants sought representation on a contingency-fee basis), and disincentives to sue emanating from both the distrust of the government's ability to be impartial and the claimants' urgent need for financial support.

122.    Because of the USDA's unequivocal refusal to honor powers of attorney, and refusal to provide any economical means for attorneys to assist with DFAP application on a contingent-fee basis, the Law Firm Plaintiffs were unable to assist any more farmers with the DFAP process. If not for the DFAP's processes, Law Firm Plaintiffs would have otherwise continued to assist additional farmers in applying for aid. This means claimants without financial means were effectively barred from seeking counsel at all in connection with the DFAP, amounting to a denial of those claimants' right to adequate process. Similarly, Claimant Plaintiffs are barred from retaining Law Firm Plaintiff's counsel for any current or future legal representation in connection to a present adversarial process against the government. Such a restriction on the right to representation amounts to a denial of adequate process and creates a significant risk that applicants will be erroneously denied benefits to which they would be entitled under the DFAP and IRA.

123.    The government's interests will not be burdened by the incorporation of additional procedure into the DFAP application processes. Payment of claims is handled not by the USDA but by government contractors; a direct payment to attorneys does not involve any greater burden or cost to the government, either directly or through its contractors. Moreover, the assistance that

attorneys provide their clients would, in fact, ease administrative burdens: attorneys will help ensure that claimants submit complete, accurate applications, and attorneys working on contingency will have a financial and ethical incentive to screen out improper and meritless claims for relief, which will provide for a smoother process for the government's review. And there is *no* legitimate government interest in allowing the USDA to summarily deny inadequately prepared claimant applications.

124.    The right to appeal a government agency's eligibility determination for receipt of benefits constitutes a significant private interest of Claimant Plaintiffs and for other known farmer claimants who apply for aid under the DFAP.

125.    The lack of any administrative appeals process creates a significant risk that applicants will be erroneously denied benefits to which they would otherwise be entitled under the DFAP and IRA.

126.    The government's interests will not be burdened by the incorporation of additional procedure into the DFAP application processes. Providing a centralized, transparent system of review will decrease the likelihood of subsequent litigation, and ensures payments are going to as many eligible farmers as possible, as Congress intended in promulgating the IRA.

127.    Applicants in the DFAP process, including Claimant Plaintiffs and other farmers who would have been represented by the Law Firm Plaintiffs if not for the restrictions at issue, were harmed and will continue to be harmed by Defendants' unlawful acts.

128.    Plaintiffs seek injunctive relief ordering: (1) that the rules and processes prohibiting payment of DFAP awards to third parties, and those refusing to honor powers of attorney, be enjoined and that Defendants cease enforcing those rules and processes; (2) that the rules and processes barring the availability for administrative review be enjoined and that Defendants cease

enforcing those rules and processes, and promulgate a system for administrative review of DFAP eligibility determinations; and (3) that any DFAP awards made to clients of the Law Firm Plaintiffs who executed powers of attorney be paid to the Law Firms, as directed in the powers of attorney.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs pray for the following relief:

A.      An order vacating and setting aside, as unlawful, the agency action prohibiting awards under the Discrimination Financial Assistance Program from being paid to attorneys at the direction of the claimant;

B.      An order directing the USDA to promulgate a method for direct payment to third-party attorneys at the claimant's direction, and to honor existing powers of attorney signed by claimants and directing such payment to attorneys;

C.      An order vacating and setting aside, as unlawful, the agency action denying any opportunity for administrative review of decisions denying awards under the Discrimination Financial Assistance Program;

D.      An order directing the USDA to promulgate a system for administrative review of the Discrimination Financial Assistance Program eligibility determinations;

E.      An order awarding Plaintiffs costs, expenses, and attorneys' fees incurred in these proceedings pursuant to 28 U.S.C. § 2412; and

F.      Such other and further relief as the Court deems just and proper.

Respectfully submitted,

**BOIES, SCHILLER FLEXNER LLP**

*/s/ Hamish P.M. Hume*
Hamish P.M. Hume (D.C. Bar No. 449914)
1401 New York Avenue, N.W.

Washington, DC 20005
Telephone: (202) 237-2727
Facsimile: (202) 237-6131
hhume@bsfllp.com

Stuart H. Singer*
Pascual Oliu*
Boies Schiller Flexner LLP
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
ssinger@bsfllp.com
poliu@bsfllp.com

*Attorneys for Plaintiffs*

*\*Pro hac vice forthcoming*